[No. 59291-2-I.   Division One.   February 4, 2008.]

*In the Matter of the Dependency of* M.S.D.

KYISHA DAVIS, *Appellant*, v. THE DEPARTMENT OF SOCIAL AND HEALTH SERVICES, *Respondent*.

470

*Maureen M. Cyr* (of *Washington Appellate Project*), for appellant.

*Robert M. McKenna, Attorney General*, and *Trisha L. McArdle, Assistant*, for respondent.

¶1 SCHINDLER, J. — Kyisha Davis appeals the trial court's determination that her daughter is a dependent child under RCW 13.34.030(5)(b). Davis contends substantial evidence does not support the finding that she neglected her daughter M.S.D. by failing to protect her from the risk posed by Davis's boyfriend, Seth Poirier. Because the Department of Social and Health Services (DSHS) did not show that Poirier's 10-year-old prior conviction for assault and criminal mistreatment of his 2-month-old baby constituted a clear and present danger to 7-year-old M.S.D.'s health, safety, or welfare, we reverse.

## FACTS

¶2 Kyisha Davis is the mother of M.S.D., who was 7 years old at the time of the dependency trial in June 2006.[1] Davis is also the mother of 14-year-old S.D.[2] Davis became

---

[1] Dependency as to M.S.D.'s father, Anthony Reed, was established by default and is not the subject of this appeal.

[2] S.D. was the subject of a third party custody action by Davis's mother, Albertine Hagler, and is not a subject of this dependency.

pregnant with S.D. as the result of an incestuous relationship with her older cousin, Melvin Day. Davis's mother, Albertine Hagler, raised Day in her home as if he were her son. Day began sexually abusing Davis when she was 12 or 13. When Davis was 15, she went to live with another family because her mother was using drugs and had lost their home. Davis's brother, Jawand Hagler, testified that the entire family was deeply traumatized by Hagler's drug use and the family's homelessness. After Davis returned to live with her mother, Day began sexually abusing her again. S.D. was born when Davis was 17 years old.

¶3 M.S.D. was born several years later in January 1999. The father, Anthony Reed, was never significantly involved in the child's life and had little ongoing contact with Davis. Not long after M.S.D. was born, Davis met Seth Poirier at a work program. Poirier had recently completed serving a prison sentence for assault of his 2-month-old baby. But Davis was under the impression that Poirier had assaulted his wife. Davis and Poirier started living together when M.S.D. was 10 months old. After Poirier moved in with her, Davis learned that the assault involved Poirier's 2-month old baby. But Davis believed Poirier when he claimed his wife committed the assault.

¶4 From 1999 until the fall of 2002 Davis, Poirier, and M.S.D. lived together without incident. Davis testified that she "wore the pants" in the relationship and she never had any doubt that she could adequately protect herself and her daughter from any risk posed by Poirier. She also said Poirier did not show signs of a temper and he avoided confrontation.

¶5 Davis testified that in September 2002, Hagler was angry with Davis because she was unwilling to give Hagler money. When Davis went to pick up M.S.D. from Hagler's house, M.S.D. did not want to stop playing and Hagler would not help Davis in retrieving her. An argument ensued between Hagler and Davis that led Davis to call the police and report that Hagler had kidnapped her daughter. When the police arrived, Hagler told them that M.S.D. had disclosed that Poirier had touched her on her "cootie bear,"

the term M.S.D. used for her pubic area. The police allowed Davis to take M.S.D. home but instructed her to have the child see a doctor. Davis took M.S.D. to the hospital the following day. The examination revealed no evidence of sexual abuse. When Davis asked M.S.D. whether Poirier had touched her inappropriately, M.S.D. denied that he had. While M.S.D. also did not disclose any inappropriate touching to the Child Protective Services (CPS) worker who interviewed her, the worker said she considered the interview equivocal.

¶6 When the CPS worker and a detective later met with the family, they told Davis about Poirier's 1997 conviction for assault in the second degree of his two-month-old baby, S.P. The detective testified that it was apparent to him that Davis was unaware of the details of the crime. In particular, Davis was not aware that the baby suffered numerous fractures. The CPS worker testified that Davis appeared to be appropriately upset and gave the impression of being "on board" with the safety plan devised at the meeting. The CPS worker and the detective agreed that during the investigation, M.S.D. would stay with Hagler and have no contact with Poirier. Poirier also agreed to take a polygraph examination.

¶7 Before Poirier's scheduled polygraph examination, Davis took M.S.D. to New Jersey to stay with her father, Warren Davis. Poirier accompanied Davis and M.S.D. to New Jersey. Davis acknowledged at trial that she regretted taking M.S.D. to New Jersey and it was a mistake, but explained that she was afraid that Hagler was scheming to make sure M.S.D. would be taken away from her permanently.

¶8 CPS then contacted the New Jersey agency. The New Jersey agency initiated an investigation and briefly placed M.S.D. in foster care. A New Jersey judge returned M.S.D. to Davis but ordered Davis not to allow any contact with Poirier. While Davis, M.S.D., and Poirier were in New Jersey, the King County Prosecutor's Office declined to file any charges against Poirier, and CPS closed the case.

¶9 About a month later, it came to the attention of the authorities that the no-contact order had been violated and the authorities placed M.S.D. in foster care again. At this point, Davis called Hagler, who flew to New Jersey. The New Jersey court restored custody of M.S.D. to Davis but then transferred custody to Hagler, who brought M.S.D. back to Washington in November 2002. Soon thereafter, Davis and Poirier also returned to Washington.

¶10 M.S.D. lived with Hagler for about six months before Davis and Hagler came to an agreement that allowed Hagler to have custody of S.D. and Davis to have custody of M.S.D. In April 2003, the superior court entered agreed orders allowing Hagler to have sole custody of S.D. and Davis to have sole custody of M.S.D. M.S.D. then returned to live with Davis and Poirier.

¶11 For the next three years no referrals were made to CPS regarding M.S.D. M.S.D. began school and Davis enrolled in truck driving school. Hagler received a subsidy from the State to provide child care for M.S.D. before and after school while Davis attended truck driving school. When DSHS learned Hagler was claiming hours while M.S.D. was in school, the State reduced the amount of the subsidy. Hagler believed Davis was responsible for the reduction in the amount she received and threatened to "fix her."

¶12 In February 2006, a referral was made to CPS alleging that Poirier had watched pornography with M.S.D. in M.S.D.'s bedroom. M.S.D. was seven years old at the time. While the investigation was pending, CPS placed M.S.D. with Hagler. When M.S.D. was interviewed by the CPS worker, the child interview specialist for the King County Prosecutor's Office, and later by the court appointed special advocate, she did not make any disclosures regarding watching pornography or sexual abuse. But the witnesses testified that when the subject of who lived in her mother's home came up, she would lower her eyes and was less interactive.

¶13 DSHS filed a dependency petition in March 2006. DSHS alleged M.S.D. was abused or neglected by "a person legally responsible for the care of the child" and "has no parent, guardian, or custodian capable of adequately caring for the child, such that the child is in circumstances which constitute a danger of substantial damage to the child's psychological or physical development." The petition was based on (1) the February 2006 report that M.S.D. had allegedly watched pornography with Poirier, (2) the 2002 allegation of possible sexual abuse, (3) Davis's flight to New Jersey with the child, and (4) Poirier's 1997 conviction for assault of a child in the second degree. DSHS placed M.S.D. with Hagler. At the shelter care hearing, the court ordered Poirier to have no contact with M.S.D. The court also ordered M.S.D. and Davis to participate in counseling as recommended by DSHS. In April 2006, Davis asked Poirier to move out of her home.

¶14 DSHS referred M.S.D. and Davis to the Harborview Sexual Assault Center for counseling. M.S.D.'s counselor testified that M.S.D. exhibited no symptoms that suggested she had been the victim of sexual abuse. The counselor testified that 95 percent of children disclose sexual abuse during the first few sessions with her. After several sessions the counselor decided not to treat M.S.D. because there was no indication of sexual assault and she was high functioning in all areas.[3]

¶15 Davis participated in a one-on-one parent education program at the Sexual Assault Center designed for parents of children who were alleged to have been sexually abused. During the sessions, her counselor, Keri Newport, testified that unlike many parents, Davis actively engaged in the sessions. Newport found Davis credible and did not consider her to be in denial. Newport testified that based on Poirier's conviction, she did not believe Poirier should have

---

[3] During her testimony, the counselor learned that in 2005, Jawand Hagler reported to Davis that M.S.D. and a peer-age female cousin had acted out sexually with one another on one occasion. In light of this information, she suggested that she would like to have additional sessions with M.S.D. to explore this incident.

any contact with M.S.D., and she hoped Davis would terminate contact with him as well. Newport provided Davis with additional information about how to find out about Poirier's 1997 conviction.

¶16 When Davis went to the courthouse to review the file concerning Poirier 1997 conviction, she was shaken by what she read. Poirier had entered a guilty plea under *North Carolina v. Alford*, 400 U.S. 25, 91 S. Ct. 160, 27 L. Ed. 2d 162 (1970) and allowed the court to rely on the certification for determination of probable cause to find a factual basis for his plea. According to the certification, Poirier's two-month-old daughter, S.P., was brought to the hospital by a babysitter because the baby's buttocks appeared to have been severely burned and her elbow was swollen. The doctors determined S.P. had suffered scald burns on her buttocks. X-rays also revealed 18 healing fractures, including seven broken ribs, several broken arm bones, both lower leg bones, and a fractured pelvis. Poirier and the child's mother were charged with assault of a child in the first degree and criminal mistreatment in the first degree. Poirier entered an *Alford* plea to the amended charges of assault of a child in second degree and criminal mistreatment in the second degree. The court sentenced Poirier to 42 months in prison. His parental rights to S.P. were terminated.[4]

¶17 In May 2006, Davis obtained a domestic violence protection order prohibiting Poirier from having contact with Davis and M.S.D. A permanent order was entered in late June 2006. However, at trial, the court found that Davis and Poirier had contact with one another in late April or May 2006.

¶18 During the 10-day bench trial in June 2006 on the dependency petition allegations, the court heard testimony from approximately 17 witnesses, including Hagler, Davis, M.S.D., the treatment providers, King County police detec-

---

[4] His parental rights to another child, M.B., were terminated by default in December 2003. This child was conceived with another woman during Poirier's relationship with Davis. Davis knew about the child.

tives, the court appointed special advocate (CASA), and the child welfare services social worker. Both the DSHS child welfare services social worker and the CASA testified that Davis's decision to stay with Poirier, despite knowing about his 1997 conviction, demonstrated that she was not able to protect M.S.D. While the CASA acknowledged that she could not quantify the risk Poirier posed and could not cite a methodology for assessing the risk, she believed that "[i]f a man will assault his own child, I think that it is reasonable to be concerned that he may assault your child."

¶19 The trial court found that the relationship between Hagler and Davis was characterized by a high degree of conflict. The trial court also specifically found that Hagler's testimony was not credible. The two incidents investigated by CPS were both initiated by reports from Hagler and coincided with conflict with Davis over money. The testimony, particularly from Jawand Hagler, also suggested that Hagler was unusually focused on sexual abuse and regularly brought the subject up with S.D. and M.S.D. Jawand testified:

> [E]ven when [S.D.] was a kid, about the same age as [M.S.D.], [Hagler] would be in front of [S.D.] telling her, oh, you tell me if anybody touch you. I don't care how they touch you. They touch you on the butt, they touch you on your thigh, you better tell me, and stuff like that. Your uncles, you can't trust your uncles, you can't — you know, you can't trust nobody. And that's how my mom always have been, you know.

¶20 The trial court found that Poirier recorded pornography using a VCR in M.S.D.'s bedroom but that there was no evidence that M.S.D. had actually seen the video.[5] And while the investigating CPS worker, C.J. Finch, testified that a child is at "high risk" in a home where pornography and masturbation are considered "normal," the trial court made no findings as to this specific point. But the trial court

---

[5] There was a suggestion that Poirier masturbated while watching the pornography, but the evidence was conflicting and the dependency court entered no finding as to this issue.

found Davis's account about Poirier's recording pornography lacked credibility. At a family team decision meeting in March 2006, Davis said that she had removed the tape from the VCR, so M.S.D. had never seen it. But at trial Davis denied knowing that Poirier had recorded pornography in M.S.D.'s room and said that she was angry with Poirier simply because he hooked up a VCR in M.S.D.'s room.

¶21 At the conclusion of the trial, the court found that "the mother neglected [M.S.D.] because she failed to protect [M.S.D.] from the risk that Seth Poirier posed." In another finding, the court also states that given Poirier's criminal history, he poses a serious risk to M.S.D. and he should not ever be around M.S.D. In its oral ruling, which is incorporated as part of the order establishing dependency as to M.S.D., the court further explained the basis for the finding of dependency:

> Seth's a dog. There is no question about it. And I believe that a caring, careful, prudent woman, even at a young age such as Kyisha was when [M.S.D.] was born, would have sensed that and would have then been very, very concerned about all the indications of what a dog this guy is. He hasn't come to court for anything. He hasn't come to court for the dependencies of his own kids. He certainly hasn't come to court to stick up for Kyisha in this case . . . . [I]t is unrebutted that Kyisha Davis is an abuse victim . . . and one of the most frequent behaviors that abuse victims have in their ongoing life is that they pick dogs for partners. And I think that's what happened here. You know, I haven't met Seth. I can't tell what's lovable or not lovable about him. It's very difficult for me to get behind what it is that caused Kyisha to maintain that contact up until a matter of days or weeks ago. But she did maintain it up until a matter of days or weeks ago. And so it's that risk that causes me to grant the dependency.

¶22 While the court concluded M.S.D. was dependent under RCW 13.34.030(5)(b) as an abused or neglected child because the mother "failed to protect [M.S.D.] from the risk Seth Poirier posed" based on his criminal conviction, the court found DSHS did not establish "a danger of substantial

damage" to M.S.D.'s physical or psychological development under RCW 13.34.030(5)(c). Because the court found that clear and convincing evidence did not support removal of M.S.D., the court allowed M.S.D. to return to Davis's care.[6] The court also expressed the concern that keeping M.S.D. with Hagler would continue to subject her to ongoing conflict and tension between Hagler and Davis. Davis appeals the court's finding that M.S.D. was dependent under RCW 13.34.030(5)(b).

## ANALYSIS

■ ¶23 Davis assigns error to several findings of fact, but the central question is whether substantial evidence supports the trial court's finding that M.S.D. was neglected due to the mother's failure to protect her from Poirier.[7]

■ ¶24 In a dependency proceeding, the State is required to prove that a child is dependent by a preponderance of the evidence. RCW 13.34.110. An appellate court will affirm an order of dependency as long as substantial evidence supports the court's findings of fact and the findings support the conclusions of law. *In re Dependency of M.P.*, 76 Wn. App. 87, 90-91, 882 P.2d 1180 (1994). Evidence is substantial if, when viewed in the light most favorable to the party prevailing below, a rational trier of fact could find the fact more likely than not to be true. *Id.*

¶25 The trial court found M.S.D. was dependent under RCW 13.34.030(5)(b). RCW 13.34.030(5)(b) defines a "dependent child" as a child who has been "abused or neglected as defined in chapter 26.44 RCW by a person legally responsible for the care of the child." RCW 26.44.020(12) defines "abuse or neglect" as

---

[6] The court indicated that it could not find by clear, cogent, and convincing evidence that a manifest danger exists that the child will suffer serious abuse or neglect if she is not removed. RCW 13.34.130(2)(c).

[7] Davis assigns error to a number of other findings of fact, which she does not address. A party waives an assignment of error not adequately argued in its brief. *Milligan v. Thompson*, 110 Wn. App. 628, 635, 42 P.3d 418 (2002); *State v. Motherwell*, 114 Wn.2d 353, 358 n.3, 788 P.2d 1066 (1990).

sexual abuse, sexual exploitation, or injury of a child by any person under circumstances which cause harm to the child's health, welfare, or safety . . . or the negligent treatment or maltreatment of a child by a person responsible for or providing care to the child.

The statute further defines "negligent treatment or maltreatment" as

an act or omission that evidences a serious disregard of consequences of such magnitude as to constitute a clear and present danger to the child's health, welfare, and safety.

Former RCW 26.44.020(15) (2000).[8]

■ ¶26  DSHS notes that the Washington Administrative Code (WAC) further defines "neglectful treatment." The WAC provisions clarify DSHS's internal procedures and do not supplement the dependency statutes. *See, e.g.,* RCW 74.13.031; RCW 74.04.050; ch. 26.44 RCW (statutory authority for WAC 388-15-009(5)). WAC 388-15-009(5) includes in its definition of "child abuse or neglect" "negligent treatment." "Negligent treatment" is defined as

an act or a failure to act . . . on the part of a child's parent, legal custodian, guardian, or caregiver that shows a serious disregard of the consequences to the child of such magnitude that it creates a clear and present danger to the child's health, welfare, or safety. A child does not have to suffer actual damage or physical or emotional harm to be in circumstances which create a clear and present danger to the child's health, welfare, and safety.

Under WAC 388-15-009(5)(b), negligent treatment or maltreatment also includes "[a]ctions, failures to act, or omissions that result in injury to or which create a substantial risk of injury to the physical, emotional, and/or cognitive development of a child."

---

[8] This statute was amended in 2005 to expand the definition of "negligent treatment or maltreatment" to include "an act" or "a failure to act" or "the cumulative effects of a pattern of conduct, behavior, or inaction" that evidences a serious disregard of consequences of such magnitude as to constitute a clear and present danger to the child's health, welfare, or safety. These amendments did not go into effect until January 2007, after the trial in this case.

¶27 Failing to protect a child from danger can provide the basis for a finding of dependency. In *In re Interest of J.F.*, 109 Wn. App. 718, 37 P.3d 1227 (2001), a girl was found dependent after her mother allowed her to travel to California with the mother's boyfriend, a long haul truck driver, whom the mother had met through a personal ad in the newspaper. The boyfriend had an extensive criminal history and had been investigated for physical abuse of other children. A previous boyfriend that the mother met through a personal ad had molested J.F. There had also been earlier reports of abuse and neglect involving this family, some of them founded. Although there was no evidence J.F. had been actually physically harmed on the trip to California, the court held that because the mother's conduct established "clear and present danger to [the child's] health, welfare and safety," such evidence was not required to establish dependency. *Id.* at 731.

¶28 This court reached a similar conclusion in *In re Dependency of S.M.H.*, 128 Wn. App. 45, 115 P.3d 990 (2005). In *In re S.M.H.*, we affirmed the termination of parental rights where DSHS established that the mother was unable to appreciate the significant risk the father of her daughter posed to her children. According to two independent evaluations of sexual deviancy, the boyfriend posed a serious risk to the children. The boyfriend admitted to sexually deviant behavior with a 10- or 11-year-old girl and forcing another girl to have sex with him on more than one occasion. The first sexual deviancy evaluation concluded that the father had " 'serious problems with regard to controlling his deviant sexual impulses towards . . . children.' " *Id.* at 50 (alteration in original). The second sexual deviancy evaluation concluded the father should have no unsupervised contact with any minor children until successfully completing treatment for sexual deviancy. *Id.* at 51. The mother had been referred to two counseling programs for nonoffending partners but had not completed either program because she did not accept that the father posed a significant risk to her children. On appeal, we con-

cluded substantial evidence supported the court's finding that no additional services could make the mother appreciate the serious risk to her children and affirmed the decision to terminate the mother's parental rights.

¶29 And in *In re Welfare of Frederiksen*, 25 Wn. App. 726, 610 P.2d 371 (1979), dependency was established as to a newborn who had never been in the care of the parents because the parents refused treatment for schizophrenia and they had already failed to care adequately for two older children. On appeal, the court affirmed the finding of dependency: "When [the child] was born to such a mother she faced a clear and present danger of suffering the same damage to her health and welfare as had already been suffered by her brother and sister, if she were left in the custody of her parents." *Id.* at 733. Because the parents were clearly incapable of properly caring for the child, the court also held there was "no need to wait until such a mother commits physical abuse or neglect and actually damages the child's development by failure to meet its physical, mental and emotional requirements if danger of such a result is clear and present." *Id.*

¶30 Here, DSHS takes the position that Poirier's criminal history alone establishes that he poses a danger to M.S.D.'s health, welfare, and safety, and supports the trial court's finding of dependency due to Davis's failure to protect her. If the dependency trial had taken place in 1999 or 2000, when M.S.D. was an infant, the significance of Poirier's criminal conviction of assault of a child and the scope of the danger to M.S.D. would weigh heavily in favor of finding a clear and present danger to M.S.D. But at the time of the dependency trial in 2006, Poirier had lived with M.S.D. for several years and there was no evidence that he ever physically abused her or any other child during that period. DSHS also presented no evidence showing that someone who has assaulted an infant approximately 10 years earlier was likely to assault a 7-year-old child. Nor was there any evidence that the risk posed by the prior conviction does not diminish with age and maturity or that Poirier was unable to change.

¶31 The dependency court's oral ruling reflects not so much a concern that Poirier would physically abuse M.S.D., but that he was a poor choice as a partner for Davis. The court speculated that the reason Davis made such a poor choice was that she had been sexually abused in her youth. While the court's assessment may be true, the poor choice of a partner is not a reason for the State to interfere in the life of a family. Only where a partner poses a clear and present danger to the child's health, welfare, and safety may a child be declared dependent. RCW 13.34.030(5)(b); RCW 26.44.020(15).

¶32 Here, unlike *In re J.F.*, Davis had not just met Poirier through a personal ad but had known Poirier and lived with him for six years before the dependency petition was filed. While Poirier's criminal history should have been a concern to Davis, the evidence showed that she was able to protect herself and M.S.D. and did not leave M.S.D. in his care.[9] Davis had known Poirier long enough and well enough to enable her to dispel the concerns that his conviction raised. Unlike the father in *In re S.M.H.*, any risk Poirier posed would have been most acute when M.S.D. was very young. The risk of harm to M.S.D. in this situation is in no way comparable to the documented risk in *In re S.M.H.* or to that of the newborn of schizophrenic parents in *In re Frederiksen*. And in contrast to the mother in *In re S.M.H.*, Davis articulated a real understanding of the nature of Poirier's conviction after she read the certification for determination of probable cause and successfully participated in counseling for nonoffending partners. While continuing contact with Poirier may not be ideal, "[i]t is not within the province of the state to make significant decisions concerning the custody of children merely because it could make a 'better' decision." *In re Custody of Smith*, 137 Wn.2d 1, 20, 969 P.2d 21 (1998).

¶33 Because the court's finding that Davis neglected M.S.D. by failing to protect her from Poirier is not sup-

---

[9] The testimony suggested that Poirier was left to supervise M.S.D. only once: when Davis could not locate child care, he took the child to the movies.

ported by substantial evidence, the finding of dependency is reversed.

APPELWICK, C.J., and BECKER, J., concur.