
IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| In the Matter of the Dependency of: | ) | No. 41111-7-III |
| | ) | |
| | ) | UNPUBLISHED OPINION |
| B.G.† | ) | |
| | ) | |

LAWRENCE-BERREY, J. — A.O., mother of B.G., appeals the juvenile court's order finding B.G. dependent under RCW 13.34.030(6)(b) and (c). She also challenges the court's disposition order. Because evidence in the record supports the challenged findings and the trial court's findings support its conclusion that B.G. is dependent, we affirm. However, we reverse and remand the disposition order because the juvenile court failed to find that the Department of Children, Youth, and Families (DCYF) made reasonable efforts to prevent B.G.'s removal from his home.

---

† To protect the privacy interests of the mother and minor child, we use their initials throughout this opinion. Gen. Ord. for Ct. of Appeals, *In re Changes to Case Title* (Wash. Ct. App. Aug. 22, 2018) (effective September 1, 2018), http://www.courts.wa.gov/appellate_trial_courts.

FACTS

In July 2023, A.O. and C.G. began using methamphetamine together and entered into an intermittent relationship. A.O. has two older children who are not part of this appeal. Although A.O. has a history of Child Protective Services (CPS) involvement because of poor supervision and methamphetamine use, neither child has been removed from her care. A.O. and her older children lived sporadically with her mother and stepfather, who assisted with caregiving.

A.O. stopped using methamphetamine when she learned she was two months pregnant with B.G. Both A.O. and C.G. presumed he was B.G.'s father and later genetic testing confirmed their assumptions. At an early obstetrics appointment, A.O. provided a urine sample that came back positive for amphetamines, methamphetamine, and morphine. A.O. reported she had been taking Adderall prescribed to her ex-husband and stated she had been taking amphetamines purchased "'on the streets.'" Report of Proceedings (RP) (Jan. 31, 2025) at 175.

B.G. was born prematurely. His umbilical cord was positive for amphetamine and methamphetamine; however, he had no signs of withdrawal. When CPS investigated, A.O. denied methamphetamine use but admitted she had been taking Adderall prescribed

to her then-husband. CPS confirmed A.O.'s account and determined no further involvement was necessary.

After B.G. was discharged, he and A.O. lived with C.G. for a week and one-half. A.O. believed they would move her older children into the home and parent them together. When it became apparent that this would not happen, A.O. and B.G. moved into her mother's house with her stepfather and her older children. C.G. began dating other people, including A.O.'s former best friend.

A.O. was B.G.'s primary caregiver except during visits with C.G. A.O. and C.G. agreed to an informal parenting arrangement where B.G. spent time at each parent's home. They drafted, but did not file, a parenting plan. Under the parenting plan, B.G. resided primarily with A.O. but visited C.G. twice a week for three hours plus an overnight visit. Although A.O. was aware C.G. used drugs, she did not feel that she needed to protect B.G. from C.G.

On one occasion, A.O. allowed her former best friend to watch B.G. for four to five hours. A.O. knew the friend had a history of using fentanyl but, to the best of her knowledge, her friend was not under the influence of anything when she watched B.G. After C.G. started dating A.O.'s former best friend, A.O. asked him to keep his girlfriend away from B.G. due to her drug history. A.O. believed that C.G. would respect her

decision but later learned he had not.

At approximately six weeks old, B.G.'s behavior changed. Initially, B.G. was a mellow quiet baby, however, he changed "like a light switch" and screamed anytime A.O. tried to burp him. RP (Feb. 7, 2025) at 347. He also started spitting up everything he ate. B.G.'s primary physician attributed this to reflux.

When B.G. was approximately two months old, he returned from a visit with C.G. with a bruise on his forehead. When A.O. asked about the bruise—which she considered unusual for a nonmobile infant—C.G. told her, "he's a boy, it's a bruise, not a big deal." RP (Feb. 7, 2025) at 345-46.

When B.G. was about three months old, A.O. picked him up from C.G., who had propped a bottle in his car seat to feed him. Although A.O. realized this was an inappropriate way to feed B.G., she intended to address it when she got home. But before she left, she heard B.G. spit up and observed milk coming from his nose. Over the next few hours, B.G. began to struggle to breathe and eventually stopped breathing and went stiff and pale. A.O. gave him rescue breaths and applied firm back blows while asking her parents to call 911. B.G. eventually expelled a significant amount of fluid and began to breathe normally.

Paramedics arrived and transported B.G. to the emergency room. The treating physician concluded B.G. had likely aspirated, prescribed antacid medication, and discharged him with instructions to return if symptoms reoccurred. A.O. informed C.G. of the hospitalization; C.G. did not come to the hospital and instead left town to celebrate his birthday.

Two days later, A.O. allowed B.G. to have an overnight visit with C.G. That evening, C.G. called A.O. and asked her to come over to check on B.G.'s breathing; shortly thereafter, he told her not to come, saying B.G. was "fine." RP (Feb. 7, 2025) at 360. When A.O. asked to come anyway, C.G. refused. A.O. had been sober since she found out she was pregnant. But between the stress of B.G.'s hospital visit, agreeing to let B.G. go overnight to C.G.'s, and "probably a bit of postpartum" depression, she used methamphetamines that night. RP (Feb. 7, 2025) at 360.

The following day, A.O. picked up B.G. from C.G.'s house and noticed he was lethargic and was breathing shallowly. C.G. reported that B.G. had a black stool overnight and had eaten less than usual. Concerned that the black stool could indicate gastrointestinal bleeding, they took B.G. to the hospital.

At the hospital, the emergency room physician ran some tests, but it appeared B.G. was well and had no difficulty breathing. However, medical staff took an x-ray to check

B.G.'s lungs. The report showed possible viral bronchiolitis. The x-ray also showed possible rib fractures, which were suspicious for abuse. Medical staff took a second set of x-rays dedicated to the ribs that showed three healing fractures on his right side and two on the left. Because B.G.'s injuries were suspicious and indicated abuse, medical staff conducted other tests to rule out alternative causes for his fractures. Additional testing did not reveal an alternative medical explanation.

CPS then submitted B.G.'s x-rays to a physician in the child abuse pediatric program at Seattle Children's Hospital, who identified additional fractures. In total, B.G. had seven rib fractures, a lumbar compression fracture, and a wrist fracture. The physician estimated B.G.'s injuries occurred several weeks to approximately one month earlier.

A.O. was shocked and upset when she found out. Neither A.O. nor C.G. could provide an explanation for B.G.'s injuries. DCYF investigated and requested oral swab testing from both parents—both declined.

The hospital placed B.G. on an administrative hold. DCYF filed a dependency petition shortly after alleging dependency based on B.G.'s status as an extremely vulnerable infant and the unexplained injuries. DCYF sought dependency under RCW 13.34.030(6)(b) and (c) and requested out-of-home placement, asserting that

immediate removal was necessary due to safety concerns.  The petition also stated that

reasonable efforts to prevent B.G.'s removal were impossible "[d]ue to the emergent

nature of the intake."  Clerks Papers (CP) at 11.  The court ordered out-of-home

placement and placed B.G. with his paternal grandparents.[1]

A.O. began visiting B.G. and engaging in recommended services.  A DCYF

social study recommended parenting education, safe and stable housing, signed releases

of information for DCYF, a drug and alcohol evaluation and compliance with its

recommendations, random urinalysis (UA) tests, and a mental health assessment and

compliance with its recommendations.

After A.O. was diagnosed with severe methamphetamine and alcohol use

disorders, she was recommended for residential inpatient treatment.  A.O. also started

providing DCYF with random UAs.  Of the 11 completed UAs, 2 came back positive for

methamphetamine and 4 came back positive for alcohol.  Her last UA, submitted around

January 15, 2025, came back positive for amphetamine, methamphetamine, and alcohol.

DCYF found A.O. compliant with the parenting classes, housing, releases of

information, and random UAs.  A.O. was partially compliant with drug and alcohol

---

[1] The court considered placing B.G. with A.O.'s parents, but A.O.'s mother was frequently sick from cancer treatments and A.O.'s stepfather worked 10 to 12 hours per day.  C.G.'s parents seemed a better option because they were mostly retired.

treatment and mental health assessment and treatment. DCYF believed B.G. could be returned to A.O.'s care if she was sober for at least six months with no missing or positive UAs.

A.O. voluntarily entered a 28-day inpatient drug and alcohol treatment that did not permit infants to reside with their mothers. She was in treatment during her dependency fact-finding hearing. A.O. also voluntarily set up a mental health evaluation upon her discharge.

*Fact-finding hearing*

The dependency fact-finding hearing began on January 31, 2025. During the hearing, the State called several witnesses including A.O.'s stepfather and three medical experts. A.O. herself was her sole witness. At the time of the fact-finding hearing, law enforcement was criminally investigating A.O. for B.G.'s injuries and the attempted murder of her ex-husband.

A.O.'s stepfather testified that A.O. and her two older children resided at their house sporadically but had resided there continuously in the last year. He described A.O. as attentive to B.G.'s needs and had no concerns about her ability to care for him. He also never heard her yell or scream or treat B.G. inappropriately. A.O.'s stepfather also noted that A.O. was actively involved in caring for her older children when she was

present. However, before B.G.'s birth, she did not consistently remain at home after the older children went to bed.

A.O. informed her stepfather that she had used methamphetamine in the past. He testified that he observed behaviors he considered unusual, including irritability and weaving head movements. He generally observed these behaviors after A.O. had been away overnight or for several days, during which time the older children remained in his and his wife's care. Over the prior year, A.O. was absent from the home overnight several times per week while the older children stayed with her parents. He testified that this did not occur when she cared for B.G. A.O. also disclosed to him that she struggled with her mental health.

DCYF called Pamela Vadnais, who supervised A.O.'s and C.G.'s visits with B.G. Ms. Vadnais testified that A.O. attended all her scheduled visits except for one time when she was sick. Ms. Vadnais described A.O. as attentive and appropriate with B.G. However, she noted occasionally that when B.G. appeared hungry, A.O. seemed hesitant to feed him. Ms. Vadnais also observed that B.G. spit up more frequently than typical.

DCYF next called Dr. Ellen Mateo, B.G.'s primary care provider. Dr. Mateo initially had concerns with B.G.'s weight gain. A.O. reported that B.G. was a fussy baby, spit up frequently, and was sometimes difficult to feed. Dr. Mateo increased the caloric

density of his formula but had no concerns about his care. Dr. Mateo believed A.O. was appropriately attentive to B.G.'s needs. B.G.'s weight subsequently improved. At B.G.'s six-month examination, Dr. Mateo reported no concerns regarding his growth or development. After reviewing B.G.'s x-rays, however, Dr. Mateo concluded his injuries were nonaccidental and could have resulted from shaking and pressure applied to his ribs and spine.

DCYF also called Dr. Jason Hoard who oversaw B.G. when he was born preterm. Dr. Hoard characterized A.O. as attentive and loving, and stated she asked appropriate questions about B.G. However, Dr. Hoard believed B.G.'s injuries were very suspicious for physical abuse. He noted these types of injuries could be caused by compressive force, like squeezing the infant's chest.

Dr. Emily Georges, a fellow in the child abuse pediatric program at Seattle Children's Hospital, also testified. After reviewing B.G.'s x-rays, Dr. Georges opined that the fractures were consistent with forceful squeezing and his lumbar fracture could have been caused by being slammed down. She noted similar lumbar fractures have been observed in children who fell from second- or third-story windows. His wrist fracture was associated with a yanking or jerking-type mechanism. She concluded his injuries were highly concerning for nonaccidental trauma. She further testified that such injuries

do not necessarily produce visible bruising and that in approximately one-half of similar cases, there were no outward signs.

During testimony, A.O. vehemently denied abusing B.G. or causing B.G.'s injuries and could not account for his injuries beyond that she was certain they did not occur in her care. A.O. did admit to using methamphetamines early in her pregnancy before she knew she was pregnant. A.O. also admitted to using methamphetamines with C.G. and using again after B.G. was taken from her care. A.O. testified that after B.G.'s removal, she left her parents' house overnight a couple of times per week and went to C.G.'s house. A.O. acknowledged that when she used methamphetamines, she could not care for her children or herself. A.O. further admitted that she had submitted altered UAs after B.G. was taken from her care and alleged C.G. had done the same. She testified that she altered the first several UAs for the first few tests, approximately from October through November 2024. A.O. admitted she was currently unavailable to parent B.G. because she was in inpatient drug treatment.

The juvenile court entered findings of dependency and disposition as to A.O. under RCW 13.34.030(6)(b) and (c) and incorporated a memorandum decision. The juvenile court found the expert medical testimony and documentary evidence credible and compelling, confirming B.G. suffered nonaccidental trauma. It further found that the

back blows A.O. administered while B.G. was struggling to breathe did not cause the rib fractures.

Although A.O. denied protecting or covering for anyone responsible for B.G.'s injuries, the court found this testimony not credible. The court concluded that A.O. maintained an ongoing dependent relationship with C.G. and acted in his interests rather than B.G.'s. The court cited A.O.'s testimony that she sought to make C.G. happy, help him avoid child support, and used drugs with him after B.G.'s removal.

The court also found, despite A.O.'s acknowledgment of her duty to protect her children, "that she gets high for hours and cannot parent her child when she is high and is currently unavailable to parent [B.G.] or her 2 older children" due to inpatient treatment. CP at 274. The court also noted two pending investigations involving A.O.: one concerning her alleged attempted overdose of her ex-husband and the other relating to B.G.'s injuries. The court acknowledged A.O.'s testimony that she did not intend to provide her ex-husband with drugs.

The court determined that placing B.G. with A.O. would be contrary to B.G.'s welfare and ordered that he remain placed with his paternal grandparents. The court found DCYF made reasonable efforts to prevent the need for B.G.'s removal because, "[g]iven the emergent nature of the injuries and the hospital hold placed on the child,

[DCYF] was not able to prevent or eliminate the need for removal of the child from the parents' care." CP at 275. It further found that B.G.'s health, safety, and welfare could not be adequately protected by placing him with A.O. and that the services identified in the social study had failed to prevent the need for out-of-home placement.

A.O. appeals.

ANALYSIS

Whether the Dependency Order is Supported by Substantial Evidence

A.O. argues DCYF did not establish by a preponderance of evidence that B.G. was abused or neglected nor did DCYF establish that B.G. had no parent capable of caring for him. We disagree.

Parents have a fundamental constitutional right to care for their child, but the State can intervene to protect the child when necessary. *In re Dependency of A.C.*, 1 Wn.3d 186, 191, 525 P.3d 177 (2023). If the rights of the parents and the welfare of their children conflict, a child's basic rights of nurture, physical and mental health, and safety prevail over the rights of the parent. RCW 13.34.020. The legislature has established a procedure for declaring a child "dependent," transferring legal custody to the State. *In re Dependency of Schermer*, 161 Wn.2d 927, 942, 169 P.3d 452 (2007). A dependency proceeding is a preliminary, remedial, nonadversarial process that does not permanently

deprive a parent of rights. *In re Welfare of Key*, 119 Wn.2d 600, 609, 836 P.2d 200

(1992). The main goal of a dependency proceeding is to enable courts to order remedial

measures to preserve and mend family ties. *Dependency of Schermer*, 161 Wn.2d at 943.

In a dependency action, DCYF is required to prove a child is dependent within the

meaning of RCW 13.34.030 by a preponderance of the evidence. RCW 13.34.110(1).

Relevant here, a "dependent child" is defined as one who:

> (b) Is abused or neglected as defined in chapter 26.44 RCW by a
> person legally responsible for care of the child;
> [or]
> (c) Has no parent, guardian, or custodian capable of adequately
> caring for the child, such that the child is in circumstances which constitute
> a danger of substantial damage to the child's psychological or physical
> development.

Former RCW 13.34.030(6) (2021).

The juvenile court found B.G. dependent under both subsections (b) and (c) of the

statute. In this appeal, A.O. challenges the adequacy of these findings. On review, we

will affirm a dependency order if substantial evidence supports the juvenile court's

findings of fact and those findings support the conclusions of law. *Dependency of

Schermer*, 161 Wn.2d at 940.

The juvenile court has broad discretion in assessing the evidence and entering a

dependency order. *Id.* at 952. We view the evidence "'in the light most favorable to the

14

prevailing party.'" *Dependency of A.C.*, 1 Wn.3d at 193 (quoting *In re Welfare of X.T.*, 174 Wn. App. 733, 737, 300 P.3d 824 (2013)). We then ask whether a rational fact finder could, more likely than not, reach the same findings as the juvenile court. *Id.* We do not reweigh evidence or assess credibility. *In re Marriage of Black*, 188 Wn.2d 114, 127, 392 P.3d 1041 (2017). Unchallenged findings are treated as verities on appeal. *In re Est. of Jones*, 152 Wn.2d 1, 8, 93 P.3d 147 (2004).

A. RCW 13.34.030(6)(b)

A.O. argues DCYF did not establish by a preponderance of evidence that B.G. was "abused or neglected" as defined by RCW 13.34.030(6)(b). We disagree.

*1. Abused*

Former RCW 13.34.030(6)(b) defines a "dependent child" as any child who "[i]s abused or neglected as defined in chapter 26.44 RCW by a person legally responsible for the care of the child." "Abuse" means "injury of a child by any person under circumstances which cause harm to the child's health, welfare, or safety." RCW 26.44.020(1).

Here, B.G. suffered nine fractures when he was only a couple of months old. All three medical expert testimonies found the fractures suspicious of abuse absent an accidental explanation. All three experts similarly described the cause of B.G.'s injuries.

15

Dr. Mateo believed B.G.'s fractures may have resulted from shaking, requiring significant force. Dr. Hoard testified that the injuries were caused by compressive force from shaking or squeezing. Dr. Georges stated that the injuries required a high amount of force at a downward angle, similar to infants who had been slammed down. Dr. Georges also stated that B.G.'s wrist fracture was likely caused by yanking or jerking. Additional testing ruled out nonabusive explanations.

Neither parent provided an explanation for the injuries, and A.O. did not present contradicting medical expert testimony. The trial court's uncontested finding is that B.G. was the victim of nonaccidental trauma. This is supported by substantial, uncontroverted evidence. However, A.O. repeatedly denied abusing B.G. A.O.'s stepfather testified he never saw A.O. act in anger or treat B.G. inappropriately. Numerous witnesses described A.O. as loving and nurturing and providing appropriate care to B.G. Without more, we cannot say, more likely than not, that A.O. abused B.G.

But even if A.O. did not abuse B.G., a trial court could still find B.G. dependent if A.O. neglected him.

*2. Neglected*

A.O. argues that her inability to explain B.G.'s injuries is not substantial evidence of neglect or abuse. We disagree because other evidence points to neglect.

"Neglect" is "the negligent treatment or maltreatment of a child by a person responsible for or providing care to the child." RCW 26.44.020(1). "'Negligent treatment or maltreatment' means an act or a failure to act, or the cumulative effects of a pattern of conduct, behavior, or inaction, that evidences a serious disregard of consequences of such magnitude as to constitute a clear and present danger to a child's health, welfare, or safety." Former RCW 26.44.020(19) (2024), *renumbered as* RCW 26.44.020(20) (LAWS OF 2025, ch. 72, § 2, effective July 27, 2025). Evidence of a parent's substance abuse is a contributing factor to negligent treatment and should be given great weight. Former RCW 26.44.020(19). A dependency finding "does not require proof of actual harm, only a 'danger' of harm." *Dependency of Schermer*, 161 Wn.2d at 951. Failure to protect a child from danger can provide the basis for dependency. *In re Dependency of M.S.D.*, 144 Wn. App. 468, 480, 182 P.3d 978 (2008).

The court found that medical testimony established B.G. suffered nonaccidental harm. A.O. does not contest this; thus, we consider it a verity. *Est. of Jones*, 152 Wn.2d at 8. A.O., as B.G.'s primary caregiver, failed to protect him. A.O. repeatedly allowed known drug users to care for her infant son. This included her former best friend and C.G. Although C.G. promised to stop using methamphetamine when B.G. was born, she suspected he continued. She knew C.G. was dating her former best friend and found out

17

he did not respect her wishes to keep his girlfriend away from B.G., though it is unclear when she realized this.

A.O. also ignored signs that indicated B.G. was in danger. B.G. came home from a visit with C.G. with a bruise on his forehead, and C.G. provided an unsatisfactory answer to its cause. To keep C.G. happy and help him avoid child support, A.O. decided not to file a parenting plan, unlike with her other children. When C.G. informed A.O. that B.G. was struggling to breathe but later told her not to come, A.O. used methamphetamines to cope with her stress instead of investigating further. Evidence of a parent's substance abuse is given great weight. Collectively, a fact finder could, more likely than not, find that A.O.'s actions were evidence of a serious disregard of the danger C.G., or others, may have posed to B.G.

The trial court found that B.G.'s out-of-home placement was required to protect his health, safety, and welfare. The trial court cited case law from *In re Interest of J.F.*, 109 Wn. App. 718, 37 P.3d 1227 (2001), and *Dependency of M.S.D.*, 144 Wn. App. 468, to support its decision. A.O. argues these cases are inapposite to the circumstances presented here.

In *Interest of J.F.*, after the daughter had been sexually abused by a man the mother met through a personal ad, CPS strongly advised her to not put her daughter where she might be at a risk of harm. 109 Wn. App. at 731. Despite the warning, the mother sent her eight-year-old daughter on a long-haul trucking trip with a man the child barely knew. *Id.* The mother met this man through a personal ad. *Id.* The mother was also aware of his extensive criminal history, including assault, protection order violations, extortion, and stalking, and knew he was prohibited by court order from seeing his own children. *Id.*

The appellate court noted that although there was no evidence the daughter had been harmed on the trip, our dependency statutes do "not require evidence of actual harm, only 'clear and present danger to the child's health, welfare and safety.'" *Id.* (internal quotation marks omitted) (quoting *In re Welfare of Frederiksen*, 25 Wn. App. 726, 733, 610 P.2d 371 (1979)). The court held that the mother's conduct met that standard and that the daughter was neglected within the definition of RCW 26.44.020. *Id.* at 731-32.

In *Dependency of M.S.D.*, a mother allowed her seven-year-old daughter to be around a man criminally convicted of assaulting his two-month-old child. 144 Wn. App. at 475. The trial court found the mother neglected her daughter by failing to protect her from the risk posed by the man's criminal history. *Id.* at 477. On review, the appellate

court noted that "[f]ailing to protect a child from danger can provide the basis for a finding of dependency." *Id*. at 480. However, the reviewing court reasoned that the man's criminal history alone did not establish he posed a danger to the daughter because the daughter was not an infant, there was no evidence the man had physically abused her after living with her for several years, and because the criminal conviction was 10 years old. *Id*. at 480-81.

A.O. argues these cases are inapposite to the circumstances presented here. Specifically, A.O. argues these cases turned on whether the mother's conduct could be defined as neglect. A.O. argues this is inapposite here because since the source of B.G.'s injuries was never confirmed, what A.O. could have done differently cannot be determined. However, A.O. cites no case that finds it necessary to identify the source of a child's injuries before the child is found dependent. As addressed above, a reasonable finder of fact could, more likely than not, find A.O. neglected B.G. because she repeatedly ignored the risk of harm posed by others.

B. RCW 13.34.030(6)(c)

A.O. argues the juvenile court erred by concluding she was not capable of adequately caring for B.G. In particular, she assigns error to four primary factors she contends the court used to support its conclusion that B.G. was a dependent child: B.G.'s

injuries, A.O.'s drug use, A.O.'s possible mental health concerns, and A.O.'s status as a person of interest in ongoing criminal investigations. A.O. asserts none of these factors substantially support that she is not capable of adequately caring for B.G., which in turn does not support a finding that B.G. is dependent under RCW 13.34.060(6)(c). We disagree.

Under RCW 13.34.030(6)(c), a child is considered dependent if they lack a parent, guardian, or custodian capable of adequately caring for them, resulting in circumstances that pose a danger of substantial damage to their psychological or physical development. A dependency finding under this statute is not predicated on a finding of abuse or neglect. *Dependency of Schermer*, 161 Wn.2d at 946. Nor does it require parental misconduct or "proof of actual harm, only a 'danger' of harm." *Id*. at 951. A trial court has broad discretion in determining when a risk of harm exists. *Id.* When assessing a parent's ability to care for a child, a trial court may consider both the child's special needs and the parent's limitations. *Id*. at 944. Mental illness alone is not proof that a parent is unfit or incapable, unless it interferes with the parent's caregiving ability. *Id*. at 945.

As with a finding under RCW 13.34.030(6)(b), the State bears the burden of proving that a child is dependent under RCW 13.34.030(6)(c) by a preponderance of

evidence. RCW 13.34.110(1). The trial court's legal conclusions must be supported by its findings of fact. *Dependency of M.S.D.*, 144 Wn. App. at 468.

We have already considered B.G.'s injuries and have concluded that substantial evidence supports the finding that he was abused and suffered actual harm. A.O. was unable to prevent that harm. There is also credible evidence from A.O. and other witnesses that established A.O.'s methamphetamine use and the risk it posed to B.G. A.O. was diagnosed with severe substance abuse disorder and recommended for inpatient treatment. A.O. used nonprescribed Adderall and methamphetamines until she learned she was pregnant with B.G. B.G.'s umbilical cord tested positive for methamphetamines. A.O. admitted she relapsed when she became stressed about leaving B.G. in C.G.'s care. Prior to B.G.'s birth, and after he was taken from her care, she often left her older children in her parents' care overnight and went to C.G.'s house, sometimes for days at a time. A.O. testified that when she went to C.G.'s house, they used methamphetamines together. A.O.'s substance use poses a risk to B.G. because A.O. admitted she could not care for her children or herself when she used illegal substances. A.O. submitted several positive UAs, including one two weeks before the dependency hearing. She also admitted to tampering with her UAs.

It is also concerning that A.O.'s coping mechanism was to turn to

methamphetamines. A.O. admitted she was probably experiencing postpartum

depression when she used methamphetamines after C.G. prohibited her from checking on

B.G. Her stepfather reported having concerns about A.O.'s mental health including

extended periods of crying. While mental illness alone does not prove a parent is unfit, if

it leads to using debilitating drugs, it interferes with the parent's caregiving ability and

poses a risk to their child's physical or psychological development.

A.O. concedes that ongoing or recent drug use can be the basis for a dependency

finding under RCW 13.34.030(6)(c) but argues her drug use does not meet a threshold

where it risks B.G.'s physical or psychological development. A.O. distinguishes her facts

with the facts presented in *In re Dependency of M.A.B.*, No. 38656-2-III (Wash. Ct. App.

Nov. 22, 2022) (unpublished), https://www.courts.wa.gov/opinions/pdf/386562_unp.pdf,

to support her proposition. Although it is an unpublished opinion and therefore holds no

precedential value, we address A.O.'s argument.

In *Dependency of M.A.B.*, we held that substantial evidence existed for a "no

parent capable" dependency finding where both mother and father were habitual and

long-term methamphetamine users who refused substance abuse assessments, treatment,

and testing, and intermittently lived in a van. No. 38656-2-III, slip op. at 20. There are

some factual differences here: A.O. has stable housing and has engaged in her substance use services in good faith. However, contrary to A.O.'s assertions, *M.A.B.* did not establish a "threshold" that identifies when a parent's substance abuse poses a risk to their child's development. Rather, it established that, under the circumstances, drug use rendered the parents incapable of adequately caring for their child.

It is undisputed that B.G. suffered nonaccidental harm. A.O. has admitted using methamphetamine and that it renders her incapable of caring for her children. A.O. turned to methamphetamine to cope with her stress. While A.O. seems very motivated to address her substance abuse, she submitted a positive UA two weeks before the fact-finding hearing. B.G. was particularly vulnerable as a nonmobile infant. Given the juvenile court's broad discretion in determining when a risk of harm exists, substantial evidence supported the court's finding that A.O. was incapable of adequately caring for B.G.

A.O. also argues that it was speculative for the juvenile court to rely on the criminal investigations of her alleged attempted murder of her ex-husband and B.G.'s injuries to find dependency. We agree.

A parent's criminal history alone is not enough to indicate their inability to care for their children. *In re Dependency of J.B.S.*, 123 Wn.2d 1, 11, 863 P.2d 1344 (1993). It

can be a relevant consideration. *Id*. But DCYF did not present enough evidence that the criminal investigations impacted A.O.'s ability to adequately care for B.G. At the time of the fact-finding hearing, there was no evidence that law enforcement was still actively investigating or that they would likely charge her. A.O. called law enforcement and offered to speak with them about the alleged attempted murder of her ex-husband but they refused to speak with her. Law enforcement questioned her four months prior about B.G.'s injuries and had no further contact with her. It is also significant that the State did not respond to A.O.'s arguments. However, even if we remove this fact from our analysis, collectively, there is still substantial evidence that A.O. was not capable of caring for B.G. without court intervention.

Lastly, A.O. argues that multiple witnesses described her as loving, attentive, and engaged in B.G.'s needs, undermining the juvenile court's conclusion that she was not a capable parent. Although several witnesses established that A.O. has positive qualities, our review is limited to whether substantial evidence supports the court's findings and whether those findings support the conclusion of dependency. *Dependency of Schermer*, 161 Wn.2d at 940. We do not reweigh evidence. *Marriage of Black*, 188 Wn.2d at 127. Reweighing these positive qualities against other evidence presented before the juvenile court is outside our scope of review on appeal. Accordingly, this argument must fail.

In light of B.G.'s injuries, A.O.'s drug use, and her mental health, we cannot say the trial court abused its discretion when it found that A.O. was more likely than not incapable of caring for B.G. without posing a substantial danger to his psychological or physical development.

C.      WHETHER THE DISPOSITION ORDER WAS PROPERLY ENTERED

A.O. contends the juvenile court erred when it entered the disposition order because it did not properly find that DCYF made reasonable efforts to prevent B.G.'s removal from his home.  The State concedes the trial court failed to find DCYF made reasonable efforts.  We accept its concession.

A disposition hearing is held after a trial court finds a child dependent. RCW 13.34.110(4).  At that disposition hearing, the court may place that dependent child out of the family home "only if the court finds that reasonable efforts have been made to prevent or eliminate the need for removal of the child from the child's home and to make it possible for the child to return home, . . . and that prevention services have been offered or provided and have failed to prevent the need for out-of-home placement, unless the health, safety, and welfare of the child cannot be protected adequately in the home, and that:

> (a)  There is no parent or guardian available to care for such child;
> (b)  The parent, guardian, or legal custodian is not willing to take custody of the child; or
> (c)  The court finds, by clear, cogent, and convincing evidence, a manifest danger exists that the child will suffer serious abuse or neglect if the child is not removed from the home and an order under RCW 26.44.063 would not protect the child from danger.

RCW 13.34.130(6).

"In determining whether reasonable efforts have been made, the court should consider the facts and circumstances of each parent." *In re Dependency of L.C.S.*, 200 Wn.2d 91, 105, 514 P.3d 644 (2022).  "[I]f the trial court concludes [DCYF] has made reasonable efforts, it must make findings on the record to support its conclusion." *Id*.

Here, the juvenile court's sole finding that attempts to address DCYF's burden is, "Given the emergent nature of the injuries and the hospital hold placed on the child, [DCYF] was not able to prevent or eliminate the need for removal of the child from the parents' care."  CP at 275.

A.O. argues that the disposition order incorrectly attempts to excuse DCYF from making reasonable efforts because it could not provide services under the emergent circumstances of the case.  A.O. contends this is contrary to *Dependency of L.C.S.* We agree.

In *L.C.S.*, the juvenile court entered a shelter care order and noted that "'under the emergent and acute circumstances in this [case] there were no reasonable efforts [DCYF] could have taken to keep the child in the home while ensuring his safety and protecting him from substantial harm.'" *Id*. at 98 (first alteration in original). On appeal, the Washington Supreme Court found that no emergent circumstances exception existed under the statute governing shelter care orders, RCW 13.34.065(5)(a)(ii). *Id*. at 102-03. The court noted that the shelter care order statute stated the child "shall" be placed with a parent unless reasonable efforts have been made to prevent removal. *Id*. at 102. A plain reading of the statute established that there was no exception to the reasonable efforts requirement. *Id*.

Washington courts have not addressed whether the Supreme Court's rejection of an emergent circumstances exception for shelter care orders under RCW 13.34.065(5)(a)(ii) extends to disposition orders under RCW 13.34.130(6). RCW 13.34.130(6) states that the court can enter a disposition order "only if" the court finds DCYF made reasonable efforts to prevent removal. This is similar to the mandatory "shall" language found in RCW 13.34.065(5)(a). We conclude that there is no emergent circumstances exception for disposition orders.

No. 41111-7-III
*Dependency of B.G.*

We remand for a new disposition hearing. When making its findings and conclusions, the juvenile court must adhere to the reasonable efforts standard described in *Dependency of L.C.S.* 200 Wn.2d at 104-08.

A majority of the panel has determined this opinion will not be printed in the Washington Appellate Reports, but it will be filed for public record pursuant to RCW 2.06.040.

_____
Lawrence-Berrey, J.

WE CONCUR:

_____    _____
Staab, C.J.                                      Cooney, J.